IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL CIECKA, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No. 15-4075 (JBS/KMW) |
| THE COOPER HEALTH SYSTEM, | |
| Defendant. | **OPINION** |

APPEARANCES:

Ari R. Karpf, Esq.
Julia W. Clark, Esq.
Karpf Karpf & Cerutti PC
3331 Street Road, Suite 128
Two Greenwood Square
Bensalem, PA 19020
      Attorneys for Plaintiff

Christine P. O'Hearn, Esq.
Brown & Connery, LLP
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108
      Attorney for Defendant

**SIMANDLE, Chief Judge:**

# I.    INTRODUCTION

In this employment discrimination case, Plaintiff Michael Ciecka alleges that he was wrongfully terminated from his position as a radiology technologist with Defendant The Cooper Health System because of his age. Plaintiff avers that he was subjected to age discrimination, retaliation, and a hostile work

environment in violation of the Age Discrimination in Employment
Act, 29 U.S.C. § 621 et seq., and the New Jersey Law Against
Discrimination, N.J.S.A. 10:5-1 et seq. The Cooper Health System
now moves before this Court for summary judgment on all of
Plaintiff's claims. For the reasons that follow, the Court will
grant in part and deny in part Cooper's motion.

## II.   BACKGROUND

Plaintiff Michael Ciecka ("Plaintiff") was employed as a
full-time radiology technologist by The Cooper Health System
("Cooper") from January 24, 2000 until his termination on
December 11, 2014. (Deposition of Michael Ciecka ("Ciecka Dep.")
[Exhibit A to Certification of Christine P. O'Hearn ("O'Hearn
Cert.")] at 41:21, 295:22-25.) Plaintiff was 52 years old at the
time of his termination. (Id. at 11:10-12.) At that time, only
four or five staff technologists at Cooper were older than
Plaintiff, in a group of about 45 employees. (Id. at 81:6-84:8.)

Radiology Technologists at Cooper

Radiology technologists at Cooper are responsible for
performing diagnostic radiographic procedures, placing patient
testing orders, completing necessary paperwork and logs, and
maintaining competency in a variety of clinical settings,
including the operating room, emergency room, trauma, general,
portable, and fluoroscopy. (Ciecka Dep. at 61:13-62:8; see also
Radiology Technologist Job Description [Ex. B to O'Hearn

2

Cert.].) Most staff technologists rotate through the different departments, and work is assigned by weekly schedules. (Deposition of Cindy Alessandrini [Ex. C to O'Hearn Cert.] at 15:6-18.) A few technologists are assigned exclusively to the operating room and are apparently held to a higher standard of competency than those who merely rotate through. (Deposition of Ron Colna ("Colna Dep.") [Ex. D to O'Hearn Cert.] at 134:8-18.) Day-to-day, cases in the operating room are assigned by a schedule set in the morning, subject to change if emergency cases came in. (Id. at 49:4-51:7.) The parties dispute how much control staff technologists have over the cases and procedures they perform. (Compare Defendant's Statement of Material Facts ("Def. SMF") ¶ 71 with Plaintiff's Statement of Material Facts ("Pl. SMF") ¶ 71, ¶¶ 170-176.)

    There are two pieces of equipment in particular that technologists use at Cooper: the O-arm and the C-arm. (Ciecka Dep. at 137:2-138:9; see also Cooper University Radiology Job Specific Responsibilities and Competency Review [Ex. F to O'Hearn Cert.].) Both pieces of equipment have been used in Cooper's operating room since at least 2010, and the competencies and requirements for operation did not change during the course of Plaintiff's employment. (Deposition of Andrea Mullison [Ex. K to Plaintiff's Statement of Material Facts ("Pl. SMF")] at 36:15-37:2.)

3

Technologists' equipment skills are evaluated during their
initial 3-month probation. (Deposition of Joseph LeBender
("LeBender Dep.") [Ex. H to O'Hearn Cert.] at 25:9-20.) Once a
technologist passes probation, he is presumed to be competent in
all of the required equipment and clinical departments. (Id.)
Thereafter, technologists are reviewed annually by their
supervisors, with a focus on a different skill each year. (Id.
at 24:19-25:8.) The Cooper Performance Evaluation form provides
space to give employees a "core value rating" and an "overall
evaluation" on a scale of "does not meet expectations (1)" to
"outstanding (5)," along with comments from their supervisor.
(See Performance Evaluation Forms Dated 2010 through 2014 [Ex.
M, N, O, P & Q to O'Hearn Cert.]; see also Performance
Evaluations [Ex. F & S to Pl. SMF].) Those employees rated
"needs improvement" or "does not meet expectations" require an
Action Plan for Improvement of Employee Performance, detailing a
description of the supervisor's concerns, a plan for
improvement, and a progress review. (See id.) Employees are
rated on a 5-point scale on core values including excellence in
service, ownership, integrity, innovation, teamwork, and
respect; their job-specific responsibilities and competencies
are also rated on a 5-point scale, for customer service/patient
care, policy and procedure compliance, miscellaneous duties,
radiation safety, workflow and patient care, image QC and

4

improvement, area competency, and computer skills. (See id.) The
Performance Evaluation form also provides space for the
supervisor to identify specific skills enhancement, training,
and education an employee should undertake to improve job
performance and set some goals and objectives for the employee's
next year. (See id.) Performance evaluations are signed by the
employee and his or her manager, who may or may not be the
"evaluator" listed on the form. (See id.)

The staff technologists at Cooper are overseen by two lead
technologists; for most of the duration of Plaintiff's
employment, they were Ronald Colna and Joseph LeBender.
(LeBender Dep. at 27:7-18.) Mr. Colna was promoted to the head
of the department in the fall of 2014 and replaced by Cindy
Alessandrini. (Id. at 27:11-12, 28:18-22.) Both lead
technologists have the same responsibilities over the staff
technologists and divide their authority between day and night
shifts. (Id. at 27:24-28:12.) Because Plaintiff routinely worked
day shifts, he reported to Mr. Colna until the fall of 2014,
when Mr. LeBender took over the day shift lead position. (Id. at
31:13-24.)

Cooper has a "progressive" disciplinary policy by which an
employee is issued a verbal and written warnings before
suspension before termination. (Id. at 29:3-5, 30:12-23.) A lead
technologist alone does not have the authority to terminate an

employee without input from a "director level or higher." (Id. at 29:24-30:5.)

Plaintiff's Performance Until June 2014

    The parties dispute how to describe Plaintiff's job performance as a radiation technologist before June 2014. Mr. Colna testified that he noticed as early as 2006 that Plaintiff avoided complex and invasive cases, and that physicians and other staff had been complaining to him about Plaintiff for years. (Colna Dep. at 63:16-66:12; see also Deposition of Matthew Harrington ("Harrington Dep.") [Ex. G to O'Hearn Cert.] at 52:3-53:2.) The parties dispute if and how Plaintiff was ever made aware of these complaints. (Compare Def. SMF ¶ 35 with Pl. SMF ¶ 25.) It is undisputed that Plaintiff was subjected to some disciplinary actions between 2009 and 2012 unrelated to the issues that allegedly gave rise to his 2014 Performance Improvement Plan. (See Discipline Forms [Ex. I, J, K, & L to O'Hearn Cert.].)

    However, Plaintiff points out that his performance evaluations were strong, and he enjoyed a close personal relationship with Mr. Colna. Specifically, Plaintiff's performance was overall rated "exceeds expectations" in both 2013 and 2014, and he was given mostly or completely scores of 4 out of 5 for his competency in operating room technology and for all "core values and actions." (See Plaintiff's 2014 Performance

6

Evaluation <u>and</u> Plaintiff's 2013 Performance Evaluation.) None of the issues raised in the 2014 Performance Improvement Plan were ever raised in his previous performance evaluations. (Colna Dep. at 107:21-108:6.)

<u>The June 2014 Grievance and Written Complaint</u>

The crux of Plaintiff's claims is that the circumstances of his employment changed drastically after events that occurred in June of 2014. On June 5, 2014, Plaintiff received a written warning for using offensive language in a conversation about a co-worker. (Progressive Discipline Form dated June 5, 2014 [Ex. R to O'Hearn Cert.].) He filed a grievance challenging the warning on June 9, 2014. (Grievance dated June 9, 2014 [Ex. U to O'Hearn Cert.]; <u>see</u> <u>also</u> Ciecka Dep. at 178:21-179:1.)

That same day, Plaintiff sent a separate letter to Cooper's Human Resources Department. (Complaint [Exhibit Y to O'Hearn Cert.].) Plaintiff told Human Resources that Mr. LeBender, his "immediate supervisor" had "made references about [his] age" while discussing the incident that gave rise to his June 5 warning. (<u>Id.</u>) He confided that "I can't help but feel as though Joe LeBender has me now in 'his crosshairs,' and I fear that my position here is in jeopardy . . . ." (<u>Id.</u>) Jill Melchiorre in Human Resources acknowledged Plaintiff's discrimination complaint and met with him on July 9, 2014 to discuss it. (Deposition of Jill Melchiorre ("Melchiorre Dep.") [Ex. AA to

7

O'Hearn Cert.] at 22:5-15; see also Notes from Ms. Melchiorre [Ex. H to Pl. SMF].) Ms. Melchiorre discussed the complaint with Mr. LeBender in July and he admitted to commenting on Plaintiff's age, although he claimed such comments were in the context of "counseling Mr. Ciecka on performance issues." (Melchiorre Dep. at 35:2-37:13; see also LeBender Dep. at 73:8-74:6.) As Plaintiff points out, Mr. LeBender presented an inconsistent timeline in his recollection of these events, seeming to confuse his June comments with Plaintiff's August Performance Improvement Plan. (See Pl. SMF ¶ 49.) The parties dispute whether any other members of the management team - especially Mr. Colna - knew about Plaintiff's discrimination complaint. (Compare Def. SMF ¶¶ 52-53 with Pl. SMF ¶¶ 52-53.) The parties also dispute whether Mr. LeBender's age-related comments were an isolated incident or whether, as Plaintiff testified, he made comments about other employees and continued to do so during Plaintiff's Performance Improvement Plan. (Ciecka Dep. at 87:1-89:5.)

The 2014 Performance Improvement Plan

A few weeks later, an incident in the operating room apparently led to management taking concrete action against Plaintiff, although the parties dispute what exactly happened. (Compare Def. SMF ¶¶ 56-63 with Pl. SMF ¶¶ 56-63.) Cooper alleges that Plaintiff created a "patient safety issue" by

8

asking an inexperienced recent graduate, Ryan DeLucas, to cover
an O-arm procedure in the operating room that Plaintiff was
supposed to take over from Matthew Harrington, one of the
radiology technologists primarily assigned to the operating
room. (Harrington Dep. at 90:23-92:5.) Apparently, Plaintiff
told Mr. DeLucas that he didn't know how to use the O-arm.
(Email string between Ryan DeLucas and Ron Colna [Ex. CC to
O'Hearn Cert.]; see also Colna Dep. at 101:4-18.) Mr. Harrington
had to walk Mr. DeLucas through the procedure and immediately
called Mr. Colna because he "felt what Mike did was unsafe."
(Harrington Dep. at 94:7-24.) Plaintiff asserts that he only
instructed Mr. DeLucas to take that case because the operating
room was short-staffed at the time and Plaintiff had to go
handle another case, that he did not know that this particular
case was an O-arm case, and that he never told Mr. DeLucas that
he did not know how to use the O-arm. (Ciecka Dep. at 206:13-
208:5.)

Mr. Colna asserts that he decided to put Plaintiff on a
Performance Improvement Plan ("the PIP" or "the Plan") because
of this incident. (Colna Dep. at 100:23-101:3, 111:9-13.) He
testified that the decision to place Plaintiff on a PIP after
that incident was a joint decision between him, Mr. LeBender,
Ms. Alessandrini, and Human Resources and that he drafted the
Plan himself. (Id.)

9

According to documentation on the PIP, Plaintiff "struggled
with maintaining a level of competency in the OR and other
Diagnostic Imaging areas." (See PIP [Ex. DD to O'Hearn Cert.].)
According the Plan, the management team was concerned that
Plaintiff did "not have the confidence level or skill set to
work independently" with the O-arm and that "[i]t has been
documented that [Plaintiff] appears to get confused and is
unable to perform basic Task" with the C-arm. (Id.) The Plan
directed that Plaintiff would be assigned to the Operating Room
and to "closely work with" one of the designated OR
technologists in order to familiarize himself with the
equipment, that Plaintiff and all other technologists would be
required to attend a workshop on the O-arm, and that Plaintiff
would meet regularly with a member of the Management Team to
evaluate his progress, with the goal of "improving his clinical
skills and as a result increase his level of self-confidence."
(Id.) Plaintiff had to fill out daily log sheets to track what
procedures he worked on during his PIP and meet regularly with
Mr. Colna to review his progress. (Ciecka Dep. at 103:3-20,
218:5-18.) The parties dispute whether Mr. Colna alone, or Mr.
Colna and Mr. LeBender together, were responsible for monitoring
Plaintiff's progress on the PIP. (Compare Def. SMF ¶¶ 75, 77
with Pl. SMF ¶¶ 75, 77.) The PIP was originally scheduled to be

10

in place from August 14, 2014 through October 17, 2014, but it
was extended to November 7, 2014. (Melchiorre Dep. at 62:7-21.)

The parties further dispute how Plaintiff performed under
the PIP. According to Cooper, Plaintiff continued to avoid O-arm
procedures and showed no initiative in trying to gain exposure
to new types of cases. (Harrington Dep. at 66:6-68:3.) Mr.
Harrington and Andrea Mullison, another technologist assigned
primarily to the operating room, both told Mr. Colna that they
did not think Plaintiff was improving during his PIP and that he
seemed nervous in the operating room. (See Harrington Dep. at
73:24-6; Mullison Dep. at 89:16-90:8, 141:3-8.) Ms. Alessandrini
testified that she, too, had the opportunity to observe
Plaintiff in the operating room during his PIP and that he could
not use the O-arm and had difficulty with the C-arm.
(Alessandrini Dep. at 44:21-46:11, 52:5-53:19.) It appears that
Plaintiff did not attend training sessions held by Ms. Mullison
for all of the staff technologists on the O-arm. (Mullison Dep.
at 118:2-22.) Physicians complained about Plaintiff's
performance and apparently stated that they did not want him
working on their cases. (Harrington Dep. at 76:7-20, 99:5-100:8,
113:7-13; Certifications from Drs. Bussey, Graf, Yocom, Dolch,
and Mashru [Ex. KK, MM, OO, PP, and QQ to O'Hearn Cert.].) It is
undisputed that Plaintiff met with Mr. Colna three times during
the PIP, but Plaintiff disputes the accuracy of Mr. Colna's

notes indicating that Plaintiff was not improving. (<u>Compare</u> Def. SMF ¶ 103 <u>with</u> Pl. SMF ¶ 103.)

Plaintiff asserts that he was forced to adhere to rules "that no one else had to adhere to" under his PIP, despite the fact that his issues with the O-arm and C-arm were common among all staff technologists besides the technologists assigned primarily to the operating room. (Ciecka Dep. at 98:1-3; Harrington Dep. at 79:8-11; Mullison Dep. at 23:4-24:11, 92:22-93:4; Colna Dep. at 55:6-58:2.) Furthermore, Plaintiff denies that he struggled with O-arm and C-arm procedures during his PIP, and asserts that Mr. Harrington, Ms. Mullison, and Ms. Alessandrini did not spend sufficient time with him in the operating room to have the opportunity to realistically evaluate his skills because he was usually in the operating room alone. (Ciecka Dep. at 209:10-17, 213:20-214:18, 320:25-231:4; Harrington Dep. at 74:17-21.) In fact, he believes that he was not properly supported by the lead technologists during his PIP. (<u>See</u> Pl. SMF ¶ 91.) He also asserts that it was very common for physicians to complain about all of the radiology technologists except for the ones permanently assigned to the operating room. (Mullison Dep. at 26:20-28:23.) Finally, Plaintiff also notes that he had no control over the assignments he took in the operating room and that he did actually attend one of Ms. Mullison's training sessions. (Ciecka Dep. at 217:4-15.)

12

The November 2014 EEOC Complaint

Plaintiff filed a charge of discrimination with the EEOC on November 18, 2014 alleging age discrimination due to Mr. LeBender's comments and his treatment under the PIP. (Charge [Ex. RR to O'Hearn Cert.].) It is undisputed that he never told anyone at Cooper that he filed the EEOC charge.

The December 2014 Termination

Plaintiff was terminated on December 11, 2014, at his last meeting with Mr. Colna under the PIP. (Ciecka Dep. at 295:22-25.) Mr. Colna and Ms. Alessandrini were present, and it is undisputed that Human Resources approved of the decision to terminate. (Colna Dep. at 144:15-21; Melchiorre Dep. at 69:8-14.) Plaintiff believes that Mr. LeBender, although not present at the meeting, was part of the decision to terminate his employment. (Colna Dep. at 138:4-139:7; Defendant's Answers to Plaintiff's First Set of Interrogatories [Ex. M to Pl. SMF] at No. 3.) According to Mr. Colna, Plaintiff was fired for failing to improve under the PIP. (Id. at 135:1-138:10; see also Performance Plan Improvement Time Line for Michael Ciecka [Ex. TT to O'Hearn Cert.].) Mr. Colna relied on complaints from physicians and feedback from Mr. Harrington, Ms. Mullison, and Ms. Alessandrini, that "[Plaintiff] was still unable to perform to the standard expectations that we hold for all technologists"

13

in coming to the decision that "the only other option we [had] at this point [was] to terminate." (Colna Dep. at 145:1-146:4.)

Plaintiff filed this two-count action against Cooper on June 16, 2015, bringing claims for age discrimination, retaliation, and hostile work environment work environment pursuant to the ADEA and NJLAD. [Docket Item 1.] After the parties exchanged discovery, Cooper filed the instant motion for summary judgment. [Docket Item 28.] The motion is now fully briefed and the Court will decide without holding oral argument pursuant to Fed. R. Civ. P. 78.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) generally provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" such that the movant is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "genuine" dispute of "material" fact exists where a reasonable jury's review of the evidence could result in "a verdict for the non-moving party" or where such fact might otherwise affect the disposition of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts, however, fail to preclude the entry of summary judgment. Id. Conclusory, self-serving submissions cannot alone withstand a motion for summary judgment. Gonzalez v. Sec'y of Dept. of Homeland Sec., 678 F.3d

14

254, 263 (3d Cir. 2012) (internal citations omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, here the Plaintiff, and must provide that party the benefit of all reasonable inferences. Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014). However, any such inferences "must flow directly from admissible evidence [,]" because "'an inference based upon [] speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'" Halsey, 750 F.3d at 287 (quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir. 1990); citing Anderson, 477 U.S. at 255).

IV. **DISCUSSION**

The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., prohibits discrimination in employment with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). Under the New Jersey Law Against Discrimination

15

("NJLAD"), N.J.S.A. 10:5-1 et seq., an employer may not discriminate or take any unlawful employment practice "because of . . . age." N.J.S.A. 10:5-12(a). Both statutes also make it unlawful for an employer to retaliate against any employee who opposes any discriminatory employment practice, files a complaint, or participates in an investigation, proceeding, or litigation. 29 U.S.C. § 623(d); N.J.S.A. 10:5-12(d). Since claims under the ADEA and NJLAD utilize the same analytical framework, the Court will discuss the state and federal claims together. Turner v. Schering-Plough Corp., 901 F.2d 335, 341 (3d Cir. 1990).

### A. Defendant Is Not Entitled to Summary Judgment on Plaintiff's Age Discrimination Claims

Counts I and II of the Complaint allege age discrimination in violation of the ADEA and NJLAD. Liability for discrimination "depends on whether the protected trait (under the ADEA age) actually motivated the employer's decision." Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993). A plaintiff must show that his "age was the 'but-for' cause of the employer's adverse action." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009). It is not enough to show that age was a "motivating factor" in the employers' decision; age must have a "determinative influence." Id. at 176 (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)).

16

The burden shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) applies to discrimination claims under the ADEA. <u>Turner</u>, 901 F.2d at 341-42. The <u>McDonnell Douglas</u> analysis proceeds in three stages. First, the plaintiff must establish a prima facie case of discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802. In an age discrimination case, a discharged employee must show "(1) that he belongs to the protected class, i.e., is older than forty; (2) was qualified by training and experience for the job from which he was discharged; and (3) was replaced by a person sufficiently younger to permit an inference of age discrimination." <u>Turner</u>, 904 F.3d at 342 (citing <u>Sorba v. Penn. Drilling Co.</u>, 821 F.2d 200, 202 (3d Cir. 1987)). The burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the plaintiff's termination. <u>Id.</u> If defendant does this, the burden shifts back to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Jones v. School Dist. Of Philadelphia</u>, 198 F.3d 403, 410 (3d Cir. 1999). Although this burden of production shifts from party to party, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Id.</u>

17

The parties assume, and the Court will as well, that Plaintiff has presented sufficient evidence to establish a prima facie case for age discrimination. Cooper argues that it is entitled to summary judgment because it presents a legitimate, nondiscriminatory reason for Plaintiff's termination which he cannot rebut as pretext for discriminatory animus. Plaintiff, in turn, argues that summary judgment is inappropriate because he can point to evidence in the record showing that he was placed on the PIP because he complained about Mr. LeBender's age-related comments and that he was held to disproportionate standards under the PIP because Mr. LeBender was a primary decisionmaker in Cooper's employment actions. This motion requires the Court to decide whether Plaintiff has adduced evidence from which a reasonable factfinder could conclude that he could carry his burden at the third stage of the <u>McDonnell Douglas</u> analysis. For the following reasons, the Court finds that he has come forward with evidence raising a genuine dispute of material fact and will deny Defendant's motion for summary judgment on the age discrimination claim.

### 1. Cooper's legitimate, nondiscriminatory reason for Plaintiff's Termination

Consistent with the second step of the <u>McDonnell Douglas</u> analysis, Cooper presents a legitimate, nondiscriminatory reason for Plaintiff's termination. The second step "does not require

that the employer prove that the articulated legitimate,
nondiscriminatory reason was the actual reason for the adverse
employment action. Instead, the employer must provide evidence
that will allow the factfinder to determine that the decision
was made for nondiscriminatory reasons." Willis v. UPMC
Children's Hospital of Pittsburgh, 808 F.3d 638, 644 (3d Cir.
2015). Cooper has plainly made this showing, taking the position
that Plaintiff was terminated for failure to improve his
performance under the PIP.

As a staff technologist at Cooper, Plaintiff was expected
to achieve and maintain competence in the two pieces of
equipment that technologists use in the operating room during
surgery: the O-arm and the C-arm. (Ciecka Dep. at 137:2-138:9;
see also Cooper University Radiology Job Specific
Responsibilities and Competency Review.) Cooper contends that
Mr. Colna placed Plaintiff on a PIP effective August 14, 2014
due to concerns that he had "struggled with maintaining a level
of competency in the OR and other Diagnostic Imaging areas."
(See PIP [Ex. DD to O'Hearn Cert.].) According the Plan, the
management team was concerned that Plaintiff did "not have the
confidence level or skill set to work independently" with the O-
arm and that "[i]t has been documented that [Plaintiff] appears
to get confused and is unable to perform basic Task" with the C-
arm. (Id.) The Plan directed that Plaintiff would be assigned to

the Operating Room and to "closely work with" one of the
designated OR technologists in order to familiarize himself with
the equipment, that Plaintiff and all other technologists would
be required to attend a workshop on the O-arm, and that
Plaintiff would meet regularly with a member of the Management
Team to evaluate his progress, with the goal of "improving his
clinical skills and as a result increase his level of self-
confidence." (Id.)

    Mr. Colna testified at his deposition that he had received
verbal complaints from physicians and lead technologists in the
operating room about Plaintiff's performance and his willingness
to take on invasive cases in the spring of 2014, but that the
situation "came to a head" in August 2014 when Plaintiff created
a "patient safety issue" by asking an inexperienced recent
graduate to cover an O-arm procedure in the operating room
"because [he] don't know how to do this." (Colna Dep. at 87:14-
88:16, 101:6-102:22.) Mr. Colna testified that the decision to
place Plaintiff on a PIP after that incident was a joint
decision between him, Mr. LeBender, Ms. Alessandrini, and Human
Resources and that he drafted the Plan himself. (Id. at 100:23-
101:3, 111:9-13.)

    Cooper takes the position that Plaintiff's termination was
warranted because his performance did not improve as required
under the PIP, despite extending the time period for which the

Plan was in place from October 2014 until December 2014. (Colna
Dep. at 145:1-146:4, 147:11-148:22.) Mr. Colna relied on
complaints from physicians and feedback from the designated OR
technologists during the PIP about Plaintiff's performance and
confidence with the O-arm and C-arm, and input from Ms.
Alessandrini, one of the lead technologists, that "[Plaintiff]
was still unable to perform to the standard expectations that we
hold for all technologists" in coming to the decision that "the
only other option we [had] at this point [was] to terminate."
(Id. at 145:1-146:4; see also Harrington Dep. at 76:7-20, 99:5-
100:8, 113:7-13 (recalling complaints from Dr. Yocon, Dr. Graf,
and Dr. Mashru); Certifications from Drs. Bussey, Graf, Yocom,
Dolch, and Mashru [Ex. KK, MM, OO, PP, and QQ to O'Hearn
Cert.].) The Court is satisfied that Cooper has adequately
carried its burden at the second step of the McDonnell Douglas
analysis.

### 2. Plaintiff's Rebuttal

Plaintiff concedes that this is a legitimate,
nondiscriminatory reason for his termination, but maintains that
summary judgment is not warranted because factual disputes
remain over whether the PIP was pretext for Mr. LeBender's
discriminatory animus, and whether he was held to a different
standard than other staff technologists at Cooper. The Court
will deny Cooper's motion for summary judgment on Plaintiff's

age discrimination claim because he has pointed to inconsistencies in the record regarding Cooper's rationale for placing him on the PIP and terminating his employment, and circumstantial evidence that age discrimination was the motivating reason.

The Third Circuit has explained that a plaintiff may defeat summary judgment at the third step of the McDonnell Douglas analysis "by pointing to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions." Jones, 198 F.3d at 413. Only at trial is a plaintiff in an employment discrimination case required to "convince the finder of fact both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. V. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original); see also Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1992) (same). "To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." Shaner v. Synthes, 204 F.3d 494, 501 (3d Cir. 2000) (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)).

Plaintiff has successfully pointed to numerous issues in the record to rebut Cooper's stated legitimate, nondiscriminatory reason for his termination. First, Plaintiff has provided testimony from Mr. Colna that he was aware of the complaints about Plaintiff's O-arm and C-arm skills and leadership and teamwork abilities identified in the PIP for some time before Plaintiff was placed on the PIP, and yet never identified them in a performance evaluation. (See Colna Dep. at 65:5-43, 87:14-90:11, 107:21-109:1). This contradicts other evidence in the record, by which Plaintiff has shown that his employment evaluations were positive in the time leading up to the PIP, before he made his age discrimination complaint. Specifically, Plaintiff's performance was overall rated "exceeds expectations" in both 2013 and 2014, and he was given mostly or completely scores of 4 out of 5 for his competency in operating room technology and for "core values and actions." (See Plaintiff's 2014 Performance Evaluation [Ex. F to Pl. SMF] and Plaintiff's 2013 Performance Evaluation [Ex. S to Pl. SMF]). Additionally, Plaintiff has also offered evidence that he was

23

treated differently from other staff radiology technologists;
apparently many technologists, most of whom were younger than
Plaintiff, had the same deficiencies with the operating room
equipment as he did, and yet no others were put on a PIP or
otherwise disciplined. (See Harrington Dep. at 78:11-79:11;
Colna Dep. at 133:7-134:24; Mullison Dep. at 106:14-109:5;
Ciecka Dep. at 81:6-84:8.)

Finally, Plaintiff argues that there are factual disputes
surrounding some of Cooper's assertions. Specifically, Plaintiff
disputes the statement that physicians had complained about
Plaintiff's performance for years, offering testimony from one
of the permanent operating room technologists that she had never
heard complaints about Plaintiff before the summer of 2014.
(Mullison Dep. at 57:1-58:2.) Additionally, Plaintiff disputes
Cooper's recounting of the allegedly precipitating incident with
the recent graduate in the operating room: Plaintiff testified
at his deposition that he asked the graduate to cover the O-arm
procedure, before knowing the type of procedure that it was,
because there were two simultaneous procedures happening in the
operating room; that he offered to take the one that was
scheduled to last longer; and that he never told the graduate
that he didn't know how to work the O-arm. (See Ciecka Dep. at
206:17-209:9.) Although Plaintiff will have to contend at trial
with the fact that the primary decisionmakers in his case were

also all over 40, if all reasonable inferences are extended in favor of Plaintiff, a reasonable jury could believe Plaintiff's theory that his performance issues were manufactured by management as pretext for age discrimination. These material factual disputes and "inconsistencies . . . and contradictions" in Cooper's stated reason for Plaintiff's termination preclude the entry of summary judgment on this claim.

## B. Defendant Is Not Entitled to Summary Judgment on Plaintiff's Retaliation Claims

Counts I and II also allege that Cooper retaliated against Plaintiff for engaging in protected activity under the ADEA and NJLAD by reporting age-based discrimination. Both statutes make it unlawful for an employer to retaliate against any employee who opposes any discriminatory employment practice, files a complaint, or participates in an investigation, proceeding, or litigation. 29 U.S.C. § 623(d); N.J.S.A. 10:5-12(d).

The McDonnell Douglas burden-shifting framework applies to retaliation claims under the ADEA and NJLAD. Daniels v. School Dist. of Philadelphia, 776 F.3d 181, 193 (3d Cir. 2015). To state a prima facie case for retaliation, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse

action." Id. (citing Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007)); see also Battaglia v. United Parcel Service, Inc., 70 A.3d 602, 619 (N.J. 2013) (same). The employer may then present a legitimate, non-retaliatory reason for having taken the adverse employment action, which the plaintiff can then rebut as pretext. Id.

At this point, it is undisputed that Plaintiff engaged in protected activity by submitting a written complaint of age discrimination to Cooper's Human Resources Department on June 9, 2014.[1] Similarly, both parties assume that Plaintiff was subjected to two adverse employment actions: being placed on a PIP in August of 2014 and his termination on December 11, 2014.[2] Where Plaintiff and Cooper disagree is whether Plaintiff can demonstrate a causal connection between his June complaint of discrimination and his adverse employment actions.

---

[1] As Cooper points out in its moving papers, Plaintiff also engaged in protected activity by filing an EEOC Complaint in November 2014. However, because Plaintiff's arguments focus solely on his June complaint to Human Resources, the Court will not consider whether there is a causal link between Plaintiff's EEOC Complaint and termination.

[2] Cooper would have this Court read Plaintiff's Opposition Brief to mean that he has abandoned his claim that the PIP is an adverse employment action. (Reply at 3, discussing Opp'n at 29.) The Court rejects this interpretation of Plaintiff's Brief and will consider whether a causal connection exists between Plaintiff's complaint and both purported adverse employment actions.

Cooper argues that Plaintiff cannot prove causation because he cannot show that the sole decisionmaker, Mr. Colna, was aware of Plaintiff's discrimination complaint. Of course, an employer cannot retaliate against an employee if the employer's decisionmaker did not know of the employee's protected activity. Moore v. City of Philadelphia, 461 F.3d 331, 351 (3d Cir. 2006). Nevertheless, Plaintiff has pointed to evidence in the record showing that Mr. Colna was not the sole decisionmaker who put Plaintiff on a PIP in August and terminated his employment in December. According to Plaintiff, the decision to place him on a PIP was a joint decision between Mr. Colna, Mr. LeBender, Ms. Alessandrini, and Human Resources, and the decision to terminate his employment was made by Mr. Colna with input from Mr. LeBender and Ms. Alessandrini and with the approval of Human Resources. (Colna Dep. at 100:23-101:3, 111:9-13, 138:20-140:18.) From this, a reasonable factfinder could infer that the decision to take adverse employment actions against Plaintiff was made, at least in part, by someone with knowledge of his protected activity. Accordingly, factual disputes preclude the summary judgment on this basis.

The Third Circuit has described three ways to establish causation in a retaliation case: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism

27

couple with timing to establish a causal link," or, in the absence of that proof, (3) "the plaintiff must show that from 'the evidence gleaned from the entire record as a whole' the trier of fact should infer causation." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

The crux of Plaintiff's argument is that his position changed dramatically between the spring and summer of 2014, and that the only difference was his discrimination complaint in June. Plaintiff points to his positive performance reviews and close relationship with Mr. Colna prior to his protected activity on the one hand, and the sudden change to a PIP with "unrealistic goals" and no support, and higher expectations of performance placed on him than on other technologists who struggled with the same operating room equipment, on the other, to lead to the inference that his protected activity was the reason he was placed on the PIP and "set up to fail." (See Opp. at 35-36.) "[C]ircumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees [may] give rise to an inference of causation when considered as a whole." Marra v. Philadelphia Housing Authority, 497 F.3d 286, 302 (3d Cir. 2007) (discussing Farrell 206 F.3d at 280-81). The Court is satisfied that Plaintiff has made a prima facie showing for his retaliation claim, and for the reasons discussed above, has

presented enough evidence to rebut Cooper's legitimate,

nondiscriminatory reason as pretext.

It would be improper for the Court to enter summary

judgment at the present time on this claim. There is enough

material in the record, viewed in the light most favorable to

Plaintiff, for a jury to infer that retaliation caused Plaintiff

to be placed on a PIP and terminated. A jury could choose to

read between the lines and link the few weeks between

Plaintiff's discrimination complaint and PIP with the

"inconsistencies . . . and contradictions" in Cooper's changing

assessment of Plaintiff's job performance to conclude that

Cooper unlawfully retaliated against him for making a complaint

of age discrimination. For these reasons, the Court will deny

Cooper's summary judgment motion on this claim.

### C. Defendant Is Entitled to Summary Judgment on Plaintiff's Hostile Work Environment Claims

Finally, Counts I and II also allege that Plaintiff was

subjected to a hostile work environment at Cooper after making

his complaint of discrimination against Mr. LeBender, in

violation of the ADEA and the NJLAD.[3]

---

[3] The Complaint also alleges "Age-based Hostile Work Environment" in violation of the ADEA and NJLAD, but the Court deems those claims abandoned because Plaintiff's opposition brief addresses only his claims for a hostile work environment in retaliation for his discrimination complaint.

A hostile work environment is one which is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the conditions of [his] employment and create an abusive working environment." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (internal quotation marks omitted). To prevail on a hostile work environment claim, a plaintiff must establish that "(1) he suffered intentional discrimination because of his [age]; (2) the discrimination was pervasive or regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (internal quotation marks omitted); see also Taylor v. Metzger, 706 A.3d 685, 688-89 (N.J. 1998) (holding that a hostile work environment claim under NJLAD requires a plaintiff to demonstrate "that the defendant's conduct (1) would not have occurred but for the employee's [protected status]; and [that the conduct] was (2) severe or pervasive enough to make a (3) reasonable [person of the same protected class] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.")

Under both statutes, whether conduct is severe or pervasive depends on the "totality of the circumstances." Andrews v. City

of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990); see also Taylor, 706 A.2d at 692 ("Severity and workplace hostility are measured by surrounding circumstances."). The circumstances to be considered "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993); Cutler v. Dorn, 955 A.3d 917, 925 (N.J. 2008) (same). While "offhanded comments, and isolated incidents (unless extremely serious)" are not sufficient to sustain a hostile work environment claim, Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998), the cumulative impact of incidents which individually would be insufficiently severe may create a hostile work environment. Cutler, 955 A.3d at 925; see also Andrews, 420 F.3d at 263 ("a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.")

In this case, Plaintiff avers that being placed on a PIP despite prior positive work performance evaluations and having his work closely monitored under the PIP constitutes a hostile work environment. Cooper takes the position that summary judgment is proper because this conduct was not severe or pervasive conduct so as to constitute a hostile work environment. The Court agrees. "[I]t is well-settled that being

31

closely supervised or watched does not constitute an adverse employment action that can support a [hostile work environment claim], and that having one's work micromanaged may be unpleasant but does not give rise to a hostile environment claim." McKinnon v. Gonzales, 642 F. Supp. 2d 410, 423 (D.N.J. 2009) (internal citations omitted); see also Shepherd v. Hunterdon Developmental Ctr., 803 A.2d 611, 626 (N.J. 2002) ("Similarly, without more, an employer's filing of a disciplinary action cannot form the basis of a LAD complaint."). Without evidence of further discriminatory conduct, there is no basis from which a jury could reasonably identify sufficiently serious, pervasive, offensive and humiliating conduct rising to the level of a hostile work environment. The Court will grant Cooper's motion for summary judgment on this claim.

**V.   CONCLUSION**

An accompanying Order will be entered.

**February 14, 2017**
Date

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge